24-mj-8561-PGL

# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Bryce Montoya, a Special Agent with the Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I have been employed as a Special Agent with the FBI since May 2018. I am currently assigned to the FBI Boston Child Exploitation and Human Trafficking Task Force, where I investigate Violent Crimes Against Children ("VCAC"). While employed by the FBI, I have investigated federal criminal violations related to, among other things, the online sexual exploitation of children. As a Special Agent with the FBI, I have conducted numerous investigations into the production, attempted production, distribution, receipt, and possession of child pornography, to include executing federal search warrants and criminal complaints. Additionally, prior to my assignment on the Child Exploitation and Human Trafficking Task Force, I was assigned to the Boston Division Lakeville Resident Agency, where I investigated VCAC and Human Trafficking violations, and participated in fraud, narcotics, and white-collar investigations. During my training at the FBI Academy in Quantico, Virginia, I received training on a variety of criminal investigative matters relating to conducting these types of investigations.

2. I am currently investigating Edward Garry ("GARRY"), YOB 1978, for violations of: 18 U.S.C. §§ 2251, sexual exploitation of children; 2252A, possession and receipt of child pornography; 2422(b), enticement; 2423(b), travel to engage in illicit sexual conduct; and attempt to do so (the "SUBJECT OFFENSES").

3. I make this affidavit in support of an application for a warrant to search electronic equipment, specifically: a Samsung cell phone with IMEI number 353690620124272, (hereinafter, "the SUBJECT PHONE"), that is in the possession of law enforcement investigators, as described

in Attachment A. There is probable cause to believe that the SUBJECT PHONE contains evidence, fruits, and instrumentalities of the SUBJECT OFFENSES, as described in Attachment B.

4. The statements in this Affidavit are based on my own involvement in the investigation; information provided by other FBI Special Agents, analysts, and other law enforcement officers; information obtained from other individuals; my review of records; and my training and background as a Special Agent with the FBI. Where statements of others are set forth in this affidavit, they are set forth in sum and substance and are not intended to be a verbatim record of those statements. This affidavit is intended to show merely that there is probable cause to secure a search warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

### Probable Cause to Believe That a Federal Crime Was Committed

5. I have reviewed reports authored by officers from the Brookline Police Department ("Brookline PD"). According to those reports, on Saturday, July 20, 2024, Brookline PD was contacted by a woman ("Witness A"), who became concerned when she realized her daughter ("Minor A[1]") was at a local Hilton Garden Inn hotel. Witness A tracked Minor A's location through her cell phone and attempted to contact Minor A. Minor A would not answer her mother's questions regarding which room she was in or who she was with. Witness A told Minor A that the police were coming to the hotel, and at that time Minor A met Witness A and officers from the Brookline PD in the lobby.

6. Minor A told officers she had met an adult male named Edward Garry ("GARRY")

---

[1] The identities of Witness A and Minor A are known to the government but are redacted herein in the interest of their privacy.

2

on Snapchat[2] approximately two weeks prior. Minor A told officers that GARRY was at the hotel with her, and that they had been in room 313. Minor A initially denied that she and GARRY had any sexual contact. Minor A showed officers a Snapchat image of the man she identified as GARRY sitting in their hotel room. Minor A also showed officers the Snapchat "display name" of the individual she had been communicating with, which was listed as "Ed Garry."

7. Minor A then met officers at the Brookline PD headquarters where she was interviewed further. Minor A again said that she met GARRY two weeks earlier on Snapchat. Minor A stated that GARRY told her that he was 35 years old, and she told him she was 14 years old.[3] Minor A stated that she and GARRY then began communicating "all day long." GARRY told Minor A that he lived in Pennsylvania, told her he was in the process of getting a divorce, and provided Minor A with a $75 gift card to Amazon via email. Minor A showed officers the email with the Amazon gift card.

8. Minor A stated that she and GARRY began exchanging nude images through Snapchat. Minor A stated that she no longer has these images because "Snapchat deletes everything," but that she has nude images of herself on her phone that she sent to GARRY.

9. Minor A stated that a week prior, she and GARRY began to discuss meeting in person. Minor A stated that GARRY had booked a room at the Hilton Garden Inn in Brookline, Massachusetts, had booked a flight, and had originally planned on arriving in the Boston area on Friday, July 19, 2024. Minor A stated that GARRY had advised Minor A on July 19, 2024 that his flight had been canceled, and that he would drive instead.

---

[2] Snapchat is an American multimedia message application developed by Snap Inc. One of the principal features of Snapchat is that pictures and messages are usually only available for a short time before they become inaccessible to their recipients.

[3] GARRY's YOB is 1978, making his true age at the time of the investigation 45 years old.

3

10. Minor A stated that on the morning of July 20, 2024 she arrived at the hotel and went to room 313. GARRY opened the door and immediately kissed Minor A. Minor A stated that she and GARRY engaged in oral, vaginal, and anal intercourse, and that GARRY did not wear a condom during intercourse. Minor A stated that GARRY was sweating, so they decided to take a shower together, at which point they had intercourse again. Minor A said that at this point her mother called and told Minor A to meet her in the hotel lobby.

11. Witness A told officers that Minor A suffers from Autism, ADHD, Asperger's, and generalized anxiety and depression disorders. Minor A was brought to the Boston Children's Hospital. Minor A's clothing was collected by members of the Brookline PD and has been sent to the Massachusetts State Police for analysis.

**Identification of Edward GARRY**

12. According to Brookline PD reports, officers set up a perimeter around the Hilton Garden Inn while other officers were interviewing Minor A. The officers observed a vehicle exit the hotel garage bearing Pennsylvania license plate "KNC4225." The vehicle appeared to be occupied with one male driver. According to records held by the Pennsylvania RMV, the vehicle was registered to Edward GARRY, YOB 1978.

13. According to records held by the Hilton Garden Inn, GARRY rented room 313 through a third-party vendor, Expedia, for July 19, 2024, through July 21, 2024. According to the same records, GARRY listed his date of birth as ##/##/1978.

14. According to members of the Massachusetts State Police Logan Airport barracks, GARRY was initially scheduled to arrive at the Boston Logan Airport on July 19, 2024 on a Spirit

4

Airlines flight departing from Pittsburgh, PA.[4]

15. Investigators also obtained information from the Massachusetts State Police Fusion Center regarding the movement of GARRY's vehicle. GARRY's license plate was registered in Sturbridge, Massachusetts on July 20, 2024 at approximately 4:18 AM EST, and again at approximately 3:28 PM EST. The license plate was last registered at the Governor Mario Cuomo Bridge in New York at approximately 5:58 PM EST on July 20, 2024.

16. On July 21, 2024, an employee of the Hilton Garden Inn contacted Brookline PD and stated that GARRY had called the hotel minutes prior from telephone number 412-508-0409. GARRY told hotel staff that he had to check out of his hotel room abruptly the day before and would like to formally check out over the phone, and that he had been staying in room 313.

17. A search of a commercially available database that aggregates public and private records held by various third parties was conducted for Edward GARRY with a date of birth ##/##/1978. These public records indicated that the telephone number listed above was associated with an account belonging to GARRY's wife.

**Arrest and Interviews of GARRY**

18. On July 22, 2024, the Brookline District Court issued an arrest warrant for GARRY (Docket # 2409CR000301) for the following:

   a. M.G.L 265 §23A: Aggravated Rape of a Child Under 16; and

   b. M.G.L 265 §26C: Enticement of a Child Under 16 for Sex.

19. On July 23, 2024, officers with the Upper St. Clair, Pennsylvania Police Department ("USCPD") conducted a traffic stop of the vehicle bearing Pennsylvania license plate

---

[4] On July 19, 2024 flights around the country were delayed or canceled due to a Microsoft/CrowdStrike outage.

5

"KNC4225". Officers found GARRY driving the vehicle and placed him under arrest.

20. On August 8, 2024, GARRY was extradited from Pennsylvania to Massachusetts.[5] When GARRY arrived at the Brookline PD, he was interviewed by investigators. The interview was audio and video recorded. I was present for that interview. Investigators read GARRY his Miranda warnings, and GARRY waived his rights and agreed to speak with investigators. GARRY stated that he met Minor A on Snapchat approximately 3 weeks prior to his arrest. GARRY said he communicated with Minor A utilizing the Snapchat accounts "@tangelo_g" and "@thompson_duke." GARRY stated that Minor A told him she was 19 years old, and that he told Minor A he was 35 years old.

21. GARRY admitted to communicating with Minor A on at least one occasion through video chat when both he and Minor A masturbated on the video chat.

22. GARRY provided his telephone number as 415-508-0409, and stated he believed his cellphone was a Samsung Galaxy S24.

23. GARRY stated that he initially had plans to fly from Pittsburgh to Boston to meet with Minor A, but on July 19, 2024, his flight was canceled. GARRY then decided to drive from Pittsburgh to Brookline, Massachusetts. GARRY stated that he had planned to take Minor A to Build-a-Bear, to go to a show, and to get dinner. GARRY again denied he knew Minor A was 14 years old. GARRY stated that he had oral, anal, and vaginal sex with Minor A in the hotel room.

24. On the evening of August 8, 2024, GARRY requested to speak with investigators again. Investigators again read GARRY his Miranda warnings, and GARRY agreed to speak to investigators without an attorney present. GARRY was interviewed by two Brookline PD Detectives. The interview was audio and video recorded, and I have reviewed that recording.

---

[5] GARRY remains in custody in Massachusetts.

25. During the interview, GARRY stated that he wished to provide his "complete confession." GARRY again stated that he met Minor A online through Snapchat, and admitted that he knew Minor A was 14 years old. GARRY stated that he and Minor A communicated daily for approximately 2-3 weeks.

26. GARRY stated that he had seen Minor A's nude body twice online through video chat. GARRY did not believe he knew Minor A's age the first time he saw her nude, but said he "definitely knew" her age the second time he saw her nude. GARRY stated that Minor A had multiple sex toys that she showed him "in use," and that Minor A showed GARRY multiple nude images and videos of herself.

27. GARRY told investigators that while he was with Minor A in the hotel room, Minor A's mother called her. GARRY felt that it was "get out of Dodge time." GARRY stated that as he was exiting the hotel lobby, he observed Minor A speaking with police officers. GARRY then immediately left the area in his vehicle and blocked Minor A on social media.

28. GARRY stated that while he has not met with other minor females in person, he has communicated with other minor females online, including a 16 year old and 17 year old who each sent GARRY nude images through Snapchat. GARRY stated he has been communicating with women and underage girls online for approximately 2 years. GARRY stated he is "guilty as hell."

29. On August 9, 2024, GARRY asked to speak with investigators again. Investigators read GARRY his Miranda warnings, and GARRY again agreed to speak with investigators without an attorney. The interview was audio and video recorded, and I have reviewed that recording.

30. During that interview, GARRY told investigators that he had used his laptop to access websites containing both pubescent and prepubescent child pornography.

7

31. GARRY also provided the names of other minor females with whom he had been communicating on Telegram and Snapchat. GARRY stated that all of these girls had exchanged nude images with him. GARRY said he had not met with any other minor females in person.

### Investigator's Possession of the SUBJECT PHONE

32. The SUBJECT PHONE is currently in the possession of the FBI, and is being stored at its facilities, as described in Attachment A. Investigators obtained the equipment in the following way:

33. When officers arrested GARRY on July 23, 2024, they observed a cell phone in plain view of GARRY's vehicle. That phone was seized and placed into a faraday bag. The cell phone was then placed into evidence at the USCPD. During his second interview on August 8, 2024, GARRY stated that this cell phone was the same cell phone that he had when he traveled to Massachusetts to meet with Minor A.

34. On July 29, 2024, a Special Agent of the FBI Pittsburgh Division retrieved the cell phone from the USCPD and placed it into the FBI Pittsburgh Evidence Control Room. The item was transferred to the FBI Boston Evidence Control Room on August 1, 2024.

### Characteristics Common to Consumers of Child Pornography

35. Based on my previous training and experience related to investigations involving child pornography and the sexual abuse of children, I have learned that individuals who create, possess, receive, distribute, or access with intent to view child pornography (collectively, "consumers" of child pornography) have a sexual interest in children and in images of children. Based upon my knowledge, experience, and training in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to such consumers of child pornography, as

outlined in the following paragraphs.

36.     The majority of consumers of child pornography are persons who have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

37.     Consumers of child pornography may collect sexually explicit materials, which may consist of hard copy and digital images and videos for their own sexual gratification. These individuals often also collect child erotica, which may consist of images or text that do not rise to the level of child pornography, but which nonetheless fuel their deviant sexual fantasies involving children. Non-pornographic, seemingly innocuous images of minors are often found on computers and digital storage devices that also contain child pornography, or that are used to communicate with others about sexual activity or interest in children. Such images are useful in attempting to identify actual minors depicted in child pornography images found during the execution of a search warrant. In certain cases, such images may also assist in determining the origins of a particular child pornography image or series of images.

38.     Many consumers of child pornography maintain their sexually explicit materials for several years and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials.[6] They regularly maintain their collections in the privacy and security of their homes, inside their cars, on their person, or in cloud-based online storage. Depending on their technical expertise, access to child pornography on seemingly "safe" networks like Tor, or struggle with addiction to child pornography, many consumers of child

---

[6] *See United States v. Morales-Aldahondo*, 524 F.3d 115, 117-119 (1st Cir. 2008) (3-year delay between last download and warrant application not too long, given affiant testimony that consumers of child pornography value collections and thus often retain them for a period of time, and consumers who use computers to access child pornography are likely to use computers to store their collections).

9

pornography have been found to download, view, and then delete child pornography on their digital devices on a cyclical and repetitive basis.

39. Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[7]

40. Consumers of child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance, and support. This contact helps these individuals to rationalize and validate their deviant sexual interest and associated behavior. The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, e-mail, bulletin boards, chat sites, web forums, instant messaging applications, and other similar vehicles of communication.

41. Consumers of child pornography often collect, read, copy, or maintain names, screen names or nicknames, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange, or commercial profit. These names may be maintained in the original medium from which they were derived, in written hardcopy, on computer storage devices, or merely on scraps

---

[7] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370-71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010)).

of paper.

42. Based upon my training and experience, I know that persons engaged in the production and possession of child erotica are also often involved in the production and possession of child pornography. Likewise, I know from training and experience that persons involved in the production and possession of child pornography are often involved in the production and possession of child erotica.

43. Based on my training, knowledge, experience, and conversations with others in law enforcement, I understand that an individual who possesses images and/or videos depicting child pornography on one digital storage device and/or Internet email or online storage account is likely to possess child pornography on additional digital storage devices and/or Internet email or online storage accounts that he possesses or controls. Additionally, based on this training and experience, I understand that even if the target uses a portable device (such as a mobile phone) to access the Internet and child pornography, it is more likely than not that evidence of this access will be found in his home, including on digital devices other than the portable device (for reasons including the frequency of "backing up" or "synching" mobile phones to computers or other digital devices).

44. Based on the facts outlined herein, I believe that GARRY likely displays characteristics common to consumers of child pornography. For example, GARRY admitted to investigators that he had communicated with multiple minors online through various applications over the course of years, had exchanged sexual images with these minors, and had attempted to view child pornography through other websites utilizing his laptop.

**Probable Cause to Believe that the SUBJECT PHONE Contains Evidence, Fruits, and Instrumentalities**

45. As outlined above, there is probable cause to believe that GARRY committed or attempted to commit the SUBJECT OFFENSES. Accordingly, there is probable cause to believe

11

that evidence, fruits, and instrumentalities of the SUBJECT OFFENSES will be found on the SUBJECT PHONE. Specifically, GARRY began communicating with Minor A through a mobile application, Snapchat. Minor A stated to police that she and GARRY communicated "all day long," and that she and GARRY had exchanged nude images. Within weeks of meeting Minor A online, GARRY made travel arrangements to meet Minor A, and drove from Pennsylvania to Brookline, Massachusetts, where he engaged in oral, vaginal, and anal sex with Minor A. Further, GARRY told investigators he had sought out websites containing child pornography.

46. As discussed above, the SUBJECT PHONE is currently being stored by the FBI at their facilities as described in Attachment A. From my training and experience and the training and experience of law enforcement personnel who routinely handle this type of equipment, I understand that it has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when it first came into the investigators' possession.

47. From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use Smartphones, such as the SUBJECT PHONE, to carry out, communicate about, and store records regarding their daily activities. These tasks are frequently accomplished through sending and receiving e-mail, instant messages, and other forms of phone or internet-based messages; scheduling activities; keeping a calendar of activities; arranging for travel; accessing personal accounts including banking information; purchasing items; searching for information on the internet; and creating and storing images and videos of their movements and activities. That is particularly true here, where, according to statements Minor A and GARRY made to the Brookline PD, GARRY was using the SUBJECT PHONE to communicate and exchange nude images with Minor A, among other things.

48.    Furthermore, I am aware that consumers of child pornography tend to keep their child pornography collections in locations that are perceived to be safe or secure, such as smartphones. In this case, Minor A stated that she had exchanged images with GARRY only through her cellular device utilizing Snapchat, which I believe makes it more likely that evidence of the SUBJECT OFFENSES will be found on the SUBJECT PHONE.

49.    Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones can now function essentially as small computers. Samsung devices, such as the SUBJECT PHONE in this case, are a type of smartphone. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

50.    From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on mobile phones.

51.    Based on my knowledge, training, experience, and information provided to me by other agents, I know that data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

    a.    Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

    b.    Even after files have been deleted, they can be recovered months or years later

       using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.     Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

## **CONCLUSION**

52. Based on the information described above, I have probable cause to believe that GARRY has committed the SUBJECT OFFENSES.

53. Based on the information described above, I also have probable cause to believe that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, are contained within the SUBJECT PHONE described in Attachment A.

Sworn to under the pains and penalties of perjury,

*Bryce Montoya /by Paul G. Levenson*
Special Agent Bryce Montoya
Federal Bureau of Investigation

Sworn before me by telephone in accordance with Fed. R. Crim. P. 4.1 this 7th day of November, 2024.

HONORABLE PAUL G. LEVENSON
UNITED STATES MAGISTRATE JUDGE